**UNITED STATES of America ex rel. Franklin HICKMAN, Jr., Petitioner-Appellant,**

**v.**

**Allyn SIELAFF, Director, Department of Corrections, and Joseph Cannon, Warden, Illinois State Penitentiary, Stateville Branch, Respondents-Appellees.**

**No. 75–1234.**

United States Court of Appeals, Seventh Circuit.

Argued June 10, 1975.

Decided Aug. 28, 1975.

Ralph Ruebner, Deputy Defender, Ira A. Moltz, Asst. Defender, Elgin, Ill., for petitioner-appellant.

William J. Scott, Atty. Gen., Thomas Connors, Asst. Atty. Gen., Chicago, Ill., for respondents-appellees.

Before CLARK, Associate Justice (Retired) *, FAIRCHILD, Chief Judge and PELL, Circuit Judge.

* Associate Justice Tom C. Clark of the Supreme Court of the United States (Retired) is sitting by designation.

PELL, Circuit Judge.

Following a jury trial in the circuit court of Winnebago County, Illinois, the defendant Franklin Hickman, Jr., was convicted of attempted murder and attempted armed robbery. His convictions were affirmed by the intermediate state appellate court. *People v. Hickman*, 3 Ill.App.3d 919, 280 N.E.2d 787 (1971). In the Supreme Court of Illinois the attempted robbery conviction was reversed for reasons not material here and the attempted murder conviction was affirmed. *People v. Hickman*, 56 Ill.2d 175, 306 N.E.2d 32 (1973). Hickman's petition for habeas corpus was denied and dismissed by the district court whose memorandum opinion is unreported. The district court issued a certificate of probable cause. The sole issue before this court is concerned with the propriety of the state trial court hearing on the voluntariness of Hickman's confession which was introduced into evidence.

The parties, however, do not state the issue in the same fashion. The petitioner states it as being "[w]hether the trial court committed reversible constitutional error in holding the petitioner's hearing on the voluntariness of his confession in the presence of the jury." The respondents phrase the issue as being "[w]hether the petitioner, at his state trial, waived his right to have a hearing on the voluntariness of his confession held outside the presence of the jury."

The second statement of the issue would seem to be a threshold question because if the position of the respondents is correct, it would not appear that we would need to pursue the resolution of the issue as stated by the petitioner. While the respondents in their brief have addressed only the waiver matter, we are not quite certain that they are prepared to concede that there was reversible error if we should hold against them on the issue as stated by them. In any event, we deem the resolution of the issue as stated by the petitioner not to be so clear that we would want to dispose of it by saying that the respondents are confessing error *sans* waiver, or, in other words, themselves waiving opposition to the basic position of the petitioner. The voluntariness issue was raised both in the Illinois Supreme Court and the federal district court. As far as we can determine, the waiver claim either was not advanced in the first of these courts or, if it was, it was deemed to be of insufficient statute to deserve mention. The waiver issue was raised in the district court which had no difficulty in determining that "petitioner has preserved his objection to having a voluntariness hearing in the presence of the jury." Both courts, while disapproving the practice of holding the voluntariness hearing in the presence of the jury, held that upon the facts of this case the confession introduced into evidence in the trial was freely and voluntarily given.

In determining the resolution of either the threshold or the ultimate issue, we do so in the light of three Supreme Court decisions and on the basis of the state trial court transcript.

The rule of constitutional proportions was laid down in *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) and confirmed by *Sims v. Georgia*, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967), that a jury is not to hear a confession unless and until the trial judge has determined that it was freely and voluntarily given. In *Jackson*, the Court emphasized that "at some stage in the proceedings" a defendant has a constitutional right "to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession." 378 U.S. at 376–77, 84 S.Ct. at 1780. In *Pinto v. Pierce*, 389 U.S. 31, 88 S.Ct. 192, 19 L.Ed.2d 31 (1967), the Court while stating, "it would seem prudent to hold voluntariness hearings outside [of] the presence of the jury," nevertheless stated that "[t]his Court has never ruled that all voluntariness hearings must be held outside the presence of the jury, regardless of the circumstances. In *Pinto*, the judge did make the determination that the confession was volun-

tary and it was therefore admitted into evidence. No claim was made that because the hearing was held in the presence of the jury it was inadequate or had any other unfair consequences for the respondent.

As we read *Pinto,* a particularly significant circumstance was that the evidence regarding voluntariness was not taken until defense counsel made it quite clear that there was no objection to having the voluntariness of the admission considered in the presence of the jury.[1] The respondents in the present case, of course, place their principal reliance upon the present case falling within the *Pinto* standard and assert that a realistic reading of the record indicates that the two requisites defined by *Pinto* were met because (1) the Winnebago County trial court made an independent finding that the confession was voluntary and (2) petitioner's counsel, by his words and actions, expressed assent to the holding of the voluntariness hearing in the jury's presence.

We turn to the state trial court transcript and in doing so we have no reluctance in saying that we are impressed by that which is implicit in the record, namely that the trial court judge did appear to be most conscious of attempting to preserve the constitutional rights of the defendant before him.

The situs at which the crime allegedly took place was a liquor store in South Beloit, Illinois. A merits issue in the criminal trial was whether the defendant was in the store in the capacity of a holdup man or merely as an innocent prospective purchaser of the commodity dispensed therein. The issue with which we are concerned in this appeal was developed in the testimony of Stanley Mickelson, a detective of the Winnebago County Sheriff's Department. Apparently Hickman was injured when hastily

departing from the store. Detective Mickelson had proceeded to Chicago upon information that Hickman could be found in Roosevelt Hospital in Chicago. Mickelson was accompanied by several officers of the Chicago Police Department. Hickman was located in the hospital and when the officers went into his room Detective Gordon of the Chicago Police Department advised Hickman "of his rights" and Mickelson read to him the complaint for arrest. Mickelson did not recall Gordon's exact words except that "[h]e advised him that he had a right to remain silent and anything he said would be used against him in a court of law, and he had the right to an attorney and such."

There were apparently four officers with Mickelson, none of whom testified in the present case on any phase thereof. Hickman was taken by the officers to district headquarters for processing. In response to the question of whether there was any conversation between any of the officers and the defendant the answer was given in the affirmative. The witness then proceeded to volunteer that "Sgt. Gordon of the Chicago PD questioned the defendant in relation to the location of the gun." This brought an objection as to the conversation at which point the trial judge said that he would hear the matter of the objection outside the presence of the jury. Counsel for the defense pointed out that nothing apparently had been said about whether the defendant could have an attorney appointed for him and that there was nothing of waiver involved yet. Counsel stated in response to a question from the court that he was interposing an objection based on the voluntariness of the conversation that the officer was apparently about to give. The colloquy then developed that in advance of trial the defense had been given notice of an

---

1. "At his trial the court asked defense counsel whether there was any objection to the testimony being taken in the presence of the jury. Defense counsel replied, 'None whatsoever.' The court continued, 'As you know, it can be taken in their presence or outside of their presence, and that is a matter of discretion with the Court but I am inquiring of you if you have any objections. If you did I would hear you but I assume you have none.' Again counsel replied, 'I have none'." *Pinto, supra,* at 33, 88 S.Ct. at 193.

oral statement reduced to writing but had had no information with regard to oral statements not reduced to writing.

The trial court then made the following statement

"Well, it gets down then to the question that if a motion had been made prior to trial for—I'll use the work [sic] 'information' to take it out of the field of whether it is a confession or an admission or whatever—if the defendant had requested that he be given notice of any information or conversations attributed to him, it is a question of whether, in the absence of such notice that they may be used in the trial. I do not believe they can be. I believe without notice of such an item the defendant would not be in a position to make a motion to suppress such alleged conversations prior to trial.

Now, he is entitled to make a motion to suppress now and a hearing outside of the presence of the jury can be conducted on the question, and this is what I take it is occurring at this moment. This, I take it, is the subject of the objection that counsel has raised."

The direct examination and cross-examination of Mickelson continued for some pages of the transcript which examination was conducted out of the hearing of the jury and developed that the defendant had orally stated that the gun was at his girl friend's house and was under a mattress in the bedroom. Upon cross-examination the matter of just what warnings were given was pursued. The following questions and answers then occurred.

"Q. All right. Do you recall the defendant saying anything after these two statements by Sgt. Gordon? Did the defendant say anything?

A. I believe he did make mention, something about an attorney or getting ahold of somebody, or notifying his mother. As to actually what he said, I don't recall.

Q. In other words, the defendant said he wanted an attorney, is that what you are saying?

A. No, I'm not saying he said it.

Q. But he did say something about an attorney?

A. He made mention of an attorney, yes.

Q. That is to the best of your recollection?

A. To the best of my recollection."

At the conclusion of this phase of the testimony which was out of the hearing of the jury the judge stated that he could not presume to tell the press what to do but he wanted to call their attention to the fact that this was a hearing outside the presence of the jury and that he was going to have to rule on the question after the hearing and if he ruled the evidence was not admissible the jury would, of course, not know about it in the course of the trial. If they should read or see overnight any evidence that he might have stricken it would mean a mistrial would necessarily have to occur.

The jury was then called in and the objection to the conversation with Sgt. Gordon was sustained. We sense from the reading of the transcript and from some of the judge's observations that he gave particular significance to the fact that since the defendant had not been notified in response to a request for confessions that oral statements had been made therefore it was appropriate to conduct a voluntariness hearing even though a motion to suppress had not been made in advance of the trial. We are not entirely clear whether the trial court considered that there might be a converse significance, i. e., that if the defendant had been aware of the oral confession or admission in advance of a trial and had not moved to suppress it that such failure would be a waiver once a trial had begun.

Upon the resumption of the trial, with the jury present, the following pertinent matters were developed. The defendant

was released to the out-of-town officers after processing and after the group left the police station in Chicago, Hickman was met by his girl friend and his mother. At some time before leaving Chicago the police officers took the defendant to Michael Reese Hospital because the "defendant was complaining of extreme pain as the result of injuries he had suffered, and he had been in Roosevelt Hospital for that. He was taken over there to see if he could get him some relief before bringing him back to the Rockford area." The defendant was examined in the emergency room and it was determined that he had no fractures. The injuries had to do something with the hand and the leg area, the hip area, and the upper thigh. After the x-rays, "[h]e was then given a shot of some drug, whatever it was, pain killer to help him in his return to the Rockford area."

Upon arrival in Rockford, the county seat of Winnebago County, the defendant was taken to the ID Room in the Sheriff's Department where Mickelson "advised the defendant that he had a right to remain silent and not answer any questions; that anything he said could and would be used against him in a court of law; that he had a right to call an attorney and have him present with him before any questioning, and that if he couldn't afford to hire an attorney one would be appointed for him by a court of law before any questioning, if he should so desire. I then asked him if he understood these rights that I had explained to him and he answered 'Yes.' I then asked him if he wished to

talk to me, and he didn't really say one way or the other at that time. This is when he was put in the lockup at the county jail."

Later in the morning Mickelson took the defendant from the lockup area at which time Assistant States Attorney McFarland arrived. This was about 9:30 a. m. Mickelson again advised him of his rights along the lines previously given in testimony. The defendant asked about phone calls. He made one to his mother and one to the girl friend.

> "After he had made his two phone calls he advised us at this time that he would give us a statement as to the events that had taken place prior to and after the robbery."

Mickelson then read to the jury without objection two waiver forms signed by the defendants, one pertaining to the telephone call and one to the matter of his rights.[2] Present at this time in addition to the Assistant States Attorney and Mickelson was a woman clerk to transcribe the statement. The procedure for doing this was then described. The defendant was asked if he wished to sign the statement to which he replied "No, he did not want to sign anything."

Upon the question being asked whether the witness could state to the jury what the defendant said to the witness with regard to the offense of September 16 or thereabout there was an objection. Defense counsel stated that he would have to object "first of all, to anything at all coming in in the way of conversations in view of the fact that this man

2. "I, Franklin V. Hickman, having been duly advised by Stanley Mickelson, member of the Winnebago County Sheriff's Department, that I may use the telephone call to call my attorney, or anyone else, and I have declined to do so."

The second statement read as follows:

"I, Franklin V. Hickman, hereby state that I have been advised by Stanley K. Mickelson, who has identified himself as a Winnebago County Deputy Sheriff, that I have a right to remain silent and that I need not say anything to them or any other law enforcement officers if I do not desire, and that I need not answer

any questions, that in the event that I answer any questions the answer that I give can and may be used as evidence against me."

"I have further been advised by the officers that I have a right to have a lawyer present at this time and before or during any questioning hereafter by any law enforcement officers."

"I have further been advised that if I cannot afford a lawyer to be present during or before any questioning a lawyer will be provided for me."

"Having been advised as above and understanding that I have these rights I still wish to make a statement to these deputies."

had previously asked for an attorney, and apparently he had been given some phone calls. Apparently nothing more has been said about an attorney. Under the Miranda Case it is a heavy burden on the State to prove why he decided to waive an attorney, having asked for one if the questioning continued. I make my objection on that, to anything coming in that he says." The States Attorney countered in part by saying the motion was not timely to have the written conversation suppressed because counsel had been informed about this statement prior to trial and there had never been a motion to suppress. Defense counsel during subsequent colloquy observed that the first knowledge he had had that the defendant asked for an attorney at the outset of his police custody was when the witness Mickelson testified; that had he known of this conversation and of the admissions to which Mickelson was trying to testify he would have made objection, presumably by way of moving to suppress.

The court after further colloquy all out of the presence of the jury observed that he thought the best course would be to require the state "before going into the substance of the statement, to call any other witnesses that you may seek to call or choose to call or who can fully inform the Court and jury as to the circumstances of the waiver in this situation. This officer has also testified to that, but to be certain I think I will require you to bring in such further testimony in that regard as you may see fit to present."

The judge also observed "I believe the most correct approach that we can take in this situation is to hear all the circumstances having to do with everything of substance in the statement, and then I will determine whether it is admissible, whether there has been a waiver and whether the Escobito [sic] requirements have been met, and then proceed from there."

The following then occurred:

"Mr. Beynon: Could we, Your Honor, at this time—and I have a very definite reason for doing this—I feel that if I have to object each and every time and to each and every witness and each and every comment it has a very bad effect on the jury. Could the Court now rule that my objection is going to continue through each witness who is going to testify to what the defendant said?

The Court: Well, your objection already made will stand, and I have not yet ruled on it.

Mr. Beynon: All right.

The Court: And your objection goes to the admission of whatever the substance of the statement in question is concerning, and that is a standing objection until I have either sustained or overruled that objection."

It is to be noted at this point that there apparently was no consideration given by the court or by either counsel to whether the development of the contextual background in which the statement was given, which would determine whether the substance of the statement would be admitted, should be or should not be heard in the presence of the jury.

The hearing then continued in the presence of the jury with the Assistant States Attorney McFarland testifying as to the events which occurred while he was present at the Sheriff's Office and that the statement was typed but not signed. He stated that he did not know that defendant had asked for an attorney in Chicago and there was no conversation about that. Mickelson was then recalled to the stand for further testimony.

Following his testimony the court out of the hearing of the jury stated that he thought the defendant effectively and knowingly waived his rights to counsel and his right to remain silent and that he thought the defendant was fully informed as to these necessary matters and that he knowingly and voluntarily made whatever statements were made to

the officer. The objection therefore would be overruled.[3]

The judge then recalled the jury and advised the members of his ruling. The Assistant States Attorney again took the stand and testified to the substance of the statement Hickman had given to him and Mickelson. Although in this statement Hickman did not admit deliberately shooting the liquor store manager, the statement was clearly incriminating. Apparently there were some irrelevant or immaterial matters in this written statement and the Assistant States Attorney testified only to the substance of the statement. He also testified that Hickman had hurt himself when he went to get into the car and that he had fallen in the parking lot and had scraped his hand and struck his leg and this had pained him after he got in the car and had pained him when he was in Chicago and this was why he went to the hospital. Mickelson then took the stand and testified similarly as to the substance of the statement. The state rested after introducing one additional witness a ballistics expert.

During the hearing on voluntariness *no mention was made either by the court, the prosecution, or the defense counsel of the desirability or necessity of Hickman taking the stand before a final judicial determination had been made as to the admissibility of the confession.* Of course, ordinarily in the suppression hearing held out of the presence of the jury the defendant may take the witness stand to relate his version of the controlling facts. We have no way, of knowing whether it had been determined at the time of the admissibility hearing wheth-

er Hickman would take the stand in his own defense in front of the jury. Obviously if he had gone on the witness stand at the time of the admissibility hearing, which was in the presence of the jury, there would be little reason for not also being a witness on his case in chief.

In any event, after the state rested he did take the stand. He stated that when the detectives came to see him in the hospital one of them said, "This is your last chance, if you don't want to say anything we'll take care of you when we get in Rockford." He was then asked whether he had asked to see an attorney to which he replied, "Yes I did. I asked them may I make a phone call so I may be able to inquire of an attorney, or get in touch with my mother, and they told me I would be able to get one later on."

Hickman further testified that since his leg and arm were hurting he had been taken to the Reese Hospital and there had been given a shot which did not cause his pain to ease.

Further testimony related to this matter:

"A. On arriving here in Rockford I told them that my leg was hurting me very badly and I wanted to see a doctor, and the officer, there was three of them altogether, and they said they would give me some asperin [sic] which had 'PD' on them, and thereafter I told them that the pain was *still* hurting and I wanted to see a doctor, and he said 'Shortly, we want to talk to you first and after we finish talking to you you can see a doctor.'

**3.** The full text of the court's observations were as follows:

"Well, this procedure that we have followed here is slightly unusual, but I think correct.

"The jury are entitled to be informed of all the circumstances surrounding the giving and receiving of a statement. The Court, on the other hand, has the burden of determining whether under all the circumstances it was voluntary, and at this stage, if I believed it was not voluntary it would be my obligation to grant the standing motion or the standing objection *and to strike the statement.*

"I will deny the defendant's objection to the use of the matters contained in the statement, or the conversation that was testified to by the witness. I believe that the defendant effectively and knowingly waived his rights to counsel, and his right to remain silent. I think he was fully informed as to these necessary matters, and that he knowingly and voluntarily made whatever statements were made to the officers, so the objection is overruled and the people may now proceed with either of the witnesses that they wish, or whatever witnesses they wish to call."

Q. Were you given anything else to relieve any pain during the time you were being questioned?

A. No. They brought some food in and asked me did I want something to eat and I told them I wasn't able to eat.

\* \* \* \* \* \*

Q. What did you tell them?

A. I told them I wasn't going to sign it.

Q. Did you tell them why?

A. I told them—when he was questioning me, he was asking me questions, and I said 'I think this is what happened, or I'm not sure.' He kept on questioning and I said 'May I see a doctor,' and he said 'Wait a minute, we'll finish this and then we'll let you see a doctor,' and he kept on asking me questions, and I said, 'We'll [sic] I think this is what happened,' and I kept on telling him I wanted to see a doctor, and then we was talking and he was writing something down on the pad he had."

The defendant then testified to an exculpatory version of the incidents at the liquor store, and concluded by denying that he planned to rob the liquor store or to shoot the manager.

In the light of the foregoing we now consider the contention of the respondents that Hickman had waived his right to have a hearing on the voluntariness of his confession held outside the presence of the jury. Upon reading the transcript, we do not come away with a sense that the prosecution was attempting by cunning artifice to slip inculpatory confessions into the evidence. Further we have, as we previously indicated, the feeling that the trial judge was conscientiously endeavoring to preserve the constitutional rights of the defendant and to see that he had a fair trial. Counsel for defense did not object directly to the fact that testimony was being admitted in the presence of the jury concerning the events leading up to the giving of the statement but did object with reasonable vigor to the introduction of the statements themselves. We do not discern from the record that any of the participants were aware that there had previously been expressed by the highest court in the land the opinion that the holding of such a hearing in the presence of such a jury was undesirable. Waiver, of course, ordinarily connotes some knowledge that something is being waived. While we have mentioned what appears to be to us fairness aspects, or the desire for fairness in the trial, nevertheless we can only conclude that the entire proceedings were conducted somewhat on the loose side. Formalism in objections and making a record should not be an end in and of itself but these procedural aspects have been developed during the process of protecting fundamental rights as the means designed to achieve that end.

This court has recently considered the doctrine of waiver in *United States ex rel. Adams v. Bensinger,* 507 F.2d 390, (7th Cir. 1974). The rule laid down there is that the test to be applied is whether there was a deliberate tactical decision to forego the claim. In *Pinto, supra,* it is obvious that there was a deliberate decision irrespective of whether it was to the tactical advantage of the defendant there. The trial court in *Pinto,* although indicating that it thought the matter was a matter of discretion, nevertheless, inquired as to whether defense counsel had any objections to the matter being heard in the presence of the jury. It would appear to us where the decision is so clearly, definitely, and knowledgeably made that despite the language in *Adams* no particular tactical advantage need to be shown. The tactical advantage, however, assumes importance where the situation is ambiguous as it is in the present case. Counsel at no time indicated that he was consciously making a choice or indeed he at no time indicated that he was aware that he had a choice to make. He may very well have thought that the facts leading up to the giving of the statement were not per se harmful and, entertaining an idea not uncommon among lawyers that frequent objections might alienate the jury, he

may have refrained from objecting until the crucial matter of the substance of the confession was reached. This would appear to provide minimal tactical advantage. Counsel had, of course, known in advance of the written statement but did not know until Officer Mickelson was on the stand that his client had talked about an attorney in Chicago prior to being taken to Rockford. At that time he objected successfully to the oral statements made to the officers in Chicago.

■ Under the *Adams* test, which we hold as applicable here, we find "there is no basis for concluding that the failure to pursue the matter more forcefully in the state courts was an attempt to derive a tactical advantage." 507 F.2d at 392. We reject the respondents' reliance on waiver.

The question remains, of course, as to whether, irrespective of waiver, there was reversible constitutional error in holding the hearing in the manner it was here held in the presence of the jury.

In our opinion, while the question perhaps may be a close one, what happened here did not pass constitutional muster.

■ During the course of determining whether the oral statements in Chicago would be admitted, the judge became aware of the incriminating factor that the defendant's gun had been hidden under the mattress of Hickman's girl friend. Therefore, prior to the voluntariness hearing here in issue, there had been established a potential influence on the mind of the judge of the truth of the written confession. As pointed out in *Jackson v. Denno,* the determination of voluntariness should stand apart from the influence of the truth or falsity of the confession. 378 U.S. at 377, 84 S.Ct. 1774. This situation is emphasized more dramatically, however, with regard to the principal statements, the substance of which did go into evidence before the jury. Without hearing the defendant's version, the trial judge decided that the confession was voluntarily made and that Hickman was not denied counsel. It is to be noted in *Pinto* that over and above the fact that counsel consciously made the choice of permitting the hearing to be conducted in the presence of the jury, the determination of voluntariness was not made until after all evidence concerning that subject was heard which included the testimony by the respondent. We fail to see how a voluntariness hearing can be complete by just hearing one side of the situation. This has improper ex parte aspects.

The argument may be made that if the defendant's testimony was subsequently heard the judge could then declare a mistrial if he found the testimony of the defendant credible on showing nonvoluntariness. This is where the influence of the truth of the confession enters the picture because the judge had heard it and knew, in part at least, that it was true. Or course, the jury did also ultimately determine the voluntariness question but if that body was aware, as it must have been, that the judge had overruled the objections, the fact that the judge permitted the testimony to go in could not fail to have carried weight in the jury's mind. By making the determination without hearing the defendant's version, the defendant was, of course, placed under compulsion to take the stand in his own case. The opinion in *Pinto* does not discuss the matter of this compulsion but, again, there counsel consciously agreed to the conduct of the hearing in the presence of the jury.

There are two factors here that could well have reflected upon the voluntariness of a statement, the first being the fact that there had been conversation about his wanting an attorney. He stated that he had wanted an attorney and even the officer conceded that there had been some conversation about it. This was, as far as we can ascertain from the record, not known to the Assistant States Attorney at the time he came to take the statements. We do not believe that true objectivity, judges being human beings, can be brought to the ascertainment of the voluntariness question by not hearing both sides of the controversy prior to the determination of the voluntariness issue. Also, of course, here there was some indication which

was corroborated by the officer, that the defendant was in pain which, according to his own testimony, apparently continued through the time of his interrogation in Rockford. Here the trial judge did not find the defendant incredible before he made the determination; he did not find him either credible or incredible.

While we hold that this hearing did not meet constitutional requirements, the disposition does not at this point require the granting of the writ of habeas corpus. In our opinion, Hickman is entitled, as was Jackson, "to a reliable resolution of these evidentiary conflicts." 378 U.S. at 392, 84 S.Ct. at 1789. Accordingly, as in *Jackson,* the judgment denying the petitioner's writ of habeas corpus is reversed and the case is remanded to the district court to allow the State of Illinois reasonable time to afford Hickman a hearing or a new trial, failing which Hickman is entitled to be released.

Reversed and remanded.